21 F.Supp.2d 1042 (1998)
CARL D., Gail D., and Danny D., a minor, by and through his parents and next friends, Carl D. and Gail D., Plaintiffs,
v.
SPECIAL SCHOOL DISTRICT OF ST. LOUIS COUNTY, MISSOURI, Defendant.
No. 4:96CV2169 RWS.
United States District Court, E.D. Missouri, Eastern Division.
July 28, 1998.
*1043 *1044 *1045 *1046 Michael H. Finkelstein, Kevin A. Thompson, Missouri Protection & Advocacy Services, Jefferson City, MO, for plaintiffs.
James G. Thomeczek, Robert J. Thomeczek, Thomeczek Law Firm, St. Louis, MO, for defendant.

MEMORANDUM AND ORDER
SIPPEL, District Judge.
Gail and Carl D. contend that defendant the Special School District of St. Louis, Missouri ("Special School District") violated the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400-1445, by failing to provide their son Danny with a free appropriate public education. Plaintiffs seek reimbursement for the cost of sending Danny to a private school. The Special School District denies the alleged statutory violation and therefore contends that it should not be required to pay for Danny's private school education.
*1047 The Court is sympathetic to the parents' desire to do what they believed to be in the best interest of their son. However, the law of this Circuit is clear. A school district meets the statutory obligation to provide a free appropriate public education by providing educational benefit. The statute does not require the school district to provide the best possible education. This Circuit has also made it abundantly clear that parents who unilaterally change their child's school without consent of state or local officials do so at their own financial risk.
The plaintiffs' unilateral placement of Danny at a private school, despite the public school's ability to afford Danny a free appropriate public education, prevents the Court from rendering an award in plaintiffs' favor.

PROCEDURAL STATUS
Gail and Carl D. seek judicial review of decisions rendered by a due process hearing panel and by a State Level Review Officer in accordance with IDEA and Missouri's special education statute. The issues have been fully briefed, and the matter is ripe for decision.[1]

STANDARD OF REVIEW
In this proceeding, the Court is required to make an independent determination of the issues decided by the due process hearing panel and State Level Review Officer using a preponderance of the evidence standard. 20 U.S.C. § 1415(e)(2). The Court must accord "due weight" to the state administrative proceedings. Hendrick Hudson Central School District Board of Education v. Rowley, 458 U.S. 176, 205-06, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). This level of deference is less than the substantial evidence test commonly applied in administrative law cases, but takes into account the fact that the state hearing panel had the opportunity to observe the demeanor of the witnesses. Independent School Dist. No. 283 v. S.D. by J.D., 88 F.3d 556, 561 (8th Cir.1996).
Finally, it is well settled that courts should not "substitute their own notions of sound educational policy for those of the school authorities which they review." Rowley, 458 U.S. at 206, 102 S.Ct. 3034.

FINDINGS OF FACT

Danny's Disabilities
Danny is an eighteen-year old student who resides with his parents in the Kirkwood school district in St. Louis County, Missouri. Danny suffers from Tourette's Syndrome[2], Attention Deficit Disorder ("ADD")[3], obsessive-compulsive disorder ("OCD"), learning disabilities[4] and depressions[5]. Danny meets the definition of "disabled" under IDEA and is therefore eligible for special education services.
Danny's disabilities have clearly impacted his educational functioning. As a result of his disabilities, Danny has poor organizational skills, task completion problems and inattentive behaviors. Danny also has difficulty socializing with his peers.

*1048 Danny's Grade School Education

Danny attended kindergarten through fourth grade at Mary Queen of Peace, a parochial school in Webster Groves, Missouri. Beginning in kindergarten, Danny exhibited attentional, social skills and task completion problems. While in second grade, Gail D. requested that Danny be evaluated by the Special School District.[6] As a result of this evaluation, the Special School District identified Danny as learning disabled in math and written language and certified that he was eligible for special education services. The Special School District developed an individualized education program ("IEP") for Danny.[7]
Danny's parents enrolled him in the public school system for fifth grade. Danny attended North Glendale Elementary School ("North Glendale") for the 1991-1992 school year as a special education student pursuant to his September 1991 IEP. This IEP provided that Danny should receive resource room services for one period each day. While attending North Glendale, Danny appeared increasingly unhappy at home and wrote two notes expressing a desire to die. Understandably, Danny's parents were extremely concerned.
In the spring of 1992, Danny took the Missouri Mastery Aptitude Test ("MMAT"). His test results placed him in the 48th percentile in the area of language arts, the 69th percentile in science, the 33rd percentile in social studies and the 22nd percentile in math. Danny's test results prompted his parents to hire Suzanne Stockman to provide after-school tutorial instruction to Danny.
Danny also began regular group and family counseling sessions with Mr. Yunker, a licensed psychologist, in 1990. The counseling sessions continued regularly for two years. Mr. Yunker testified that Danny was experiencing obsessional thoughts, depression, feelings of worthlessness and sadness, and difficulties with school and social interaction when the counseling sessions began. Mr. Yunker stopped treating Danny on a regular basis about the time that Danny started sixth grade. Gail D. testified that she and her husband could not afford to send Danny to Mr. Yunker and Ms. Stockman on a regular basis. However, Gail D. did inform Mr. Yunker of Danny's notes about dying. In addition, Mr. Yunker counseled Danny on two or three occasions in the fall of 1992.
Danny successfully completed his fifth grade year at North Glendale and began sixth grade at Nipher Middle School in September of 1992.

Danny's Transition to Middle School
Danny's sixth grade year at Nipher Middle School forms the basis of the instant dispute.
Nipher Middle School is taught by seven "teams" of teachers at the sixth, seventh and eighth grade levels. The team concept is an extension of the middle school philosophy, which attempts to reduce the size of the school to create a smaller learning environment. The team members' classrooms are adjacent to one another and to the lockers of the children assigned to that team. This localization of activity is designed to ease students into the transition from elementary to middle school.
Nipher Middle School has three sixth grade teams: a four-member team; a three-member team; and the 6/7 team. The 6/7 team is a two-year team which includes sixth and seventh graders. Students assigned to the 6/7 team remain with the same teachers and peer group for sixth and seventh grade. Gail D. requested that Danny be placed on *1049 the 6/7 team because she thought that the continuity of instructors and classmates would benefit Danny.
As of 1995, approximately 600 students between the ages of twelve and fourteen attended Nipher Middle School. A regular classroom averaged between 22 to 27 pupils. About 100 students at Nipher Middle School received special education services during the 1995 school year. Nipher Middle School has three special education resource rooms. Children requiring more than three hours daily in the resource room are generally placed in a self-contained classroom. Nipher Middle School also offers class-within-a-class services, where a special education teacher accompanies special education students to a regular  or "mainstream"  class and works closely with the student.

Danny's Individual Education Programs (IEPs) and Experiences at Nipher Middle School
An individualized education plan was drafted for Danny's sixth grade year at Nipher Middle School in May of 1992. This new IEP mandated resource room services and accommodations, including the provision of assignment sheets, shortened math and language assignments, extended time to complete written assignments, standardized testing in an alternative environment and the dictation of answers to essay questions during tests. Danny's May 1992 IEP did not include class-within-a-class intervention.
Danny was placed on the 6/7 team. Mr. David Kaiser was his resource room instructor and responsible for informing the "mainstream" teachers about his students' IEPs. To facilitate this process, he prepared a profile sheet for each student which summarized the student's IEP goals and interventions. Although he was uncertain whether Danny's profile sheet was actually distributed to each of his mainstream instructors, his profile sheet was placed in a file accessible to all 6/7 teachers. In addition, he met weekly with the other teachers on the 6/7 team to discuss his students. This weekly meeting period served as an important intervention because it allowed Mr. Kaiser to monitor Danny's progress in the "mainstream" classes and coordinate assignments.
Mr. Kaiser had about 20 students in his caseload during the fall of 1992, and about six students were present in his classroom with Danny. Mr. Kaiser spent the majority of Danny's resource room time assisting him with homework assignments from his mainstream classes, but also provided remedial instruction related to Danny's IEP goals.
During these resource room activities, Danny was frequently "off-task" or distracted and needed redirection. Mr. Kaiser often observed Danny doodling instead of completing his assignments. Although often "off-task," Danny was not disruptive during class. Mr. Kaiser testified that he did not observe signs of depression in Danny. Instead, Mr. Kaiser classified Danny's behavior as "independent" and being "into his own thing."
Mr. Kaiser admitted that he did not always implement all of the modifications and accommodations specified in a student's IEP if the child appears to be operating "within the range of acceptability as far as the objective, or the range of expectations for a kid coming from fifth to sixth grade...."
One of Danny's modifications, the use of daily assignment sheets, was not implemented by Mr. Kaiser until the assignment sheets were specifically requested by Gail D. Mr. Kaiser recalled that assignment sheets were used with Danny, although perhaps not during the first two weeks of school, but were ineffective. As for Danny's other modifications, Mr. Kaiser believed that the 6/7 team reduced the number of homework assignments given to Danny and allowed Danny additional time to complete his schoolwork.
To assist with organizational difficulties at the middle school, Danny's locker was placed next to Mr. Kaiser's classroom. In addition, Mr. Kaiser would sometimes organize Danny's books or issue verbal reminders of homework assignments. He also communicated with Gail D. regarding Danny's homework assignments.
Danny received "C"s and one "D" on his first quarter grade report from Nipher Middle School. Gail D. was surprised to learn that Danny had earned passing marks and began to suspect that Danny's grades were not an accurate reflection of his performance. *1050 In support of this assertion, Gail D. testified that Danny failed one exam in his wellness class and neglected to return a second exam to his instructor, but nevertheless received a passing grade of "C" for the first quarter. Additionally, Danny's language arts instructor was unaware that Danny did not turn in an assignment. Modified grading was not a modification or adaptation contained in Danny's IEP.
Danny's tutor, Ms. Stockman, was also surprised by Danny's passing grades. When Ms. Stockman began tutoring Danny as a fifth grader, she evaluated his writing and math skills to be at a third or fourth grade level. Danny was unable to measure with a ruler, could not count change or write an essay.
Danny's social studies teacher at Nipher Middle School, Sandra Drake, testified that Danny's grades accurately reflected his performance for his first quarter.
Gail D. communicated regularly with Mr. Kaiser about Danny's educational progress. In October, she met with the teachers assigned to the 6/7 team and requested additional resource room time for Danny. Danny's teachers felt that additional resource room time was unnecessary and suggested that her request be reevaluated at the end of the first quarter.
Danny was extremely unhappy during his first two and one-half months at Nipher Middle School. He engaged in destructive behavior at home and frequently told Gail D. that he hated Nipher Middle School and wanted to drop out of school. Danny also threatened truancy on a regular basis and refused to do his homework.
On November 11, 1992, Gail D. found a six page essay in Danny's room describing methods to commit suicide. In response to this note, Gail D. contacted Mr. Yunker and Dr. Rohrbaugh. Dr. Rohrbaugh increased Danny's anti-depressant medication. Gail D. also began searching for an alternative educational environment for Danny.

Danny is Unilaterally Enrolled in a Private School
On November 25, 1992, Gail D. withdrew Danny from Nipher Middle School and placed him at a private school, the Metropolitan School.
Before enrolling Danny at the private Metropolitan school, Gail D. neither requested the IEP team at Nipher Middle School to reconvene nor did she request a change of placement. Gail D. had clearly concluded that Danny needed to be removed from Nipher Middle School immediately.
The Metropolitan School is a private accredited school for seventh through twelfth grade children who have atypical learning styles and have experienced failure in a regular school setting. All of the students at Metropolitan have a categorical diagnosis or are considered to be at risk.
Danny was initially placed in the "middle school" room of Metropolitan for most of his subjects. The "middle school" room is a self-contained classroom with approximately eight students who are unable to succeed in a learning environment without extensive interaction with one or two adults. The curriculum in the "middle school" room is extremely individualized. Metropolitan strives to transition the children out of the "middle school" room and into its mainstream classes.
In the mainstream classes, students are grouped according to learning styles, rather than by age or grade level. Danny was grouped with multi-modal learners requiring a significant amount of individual attention. The mainstream classes typically include seven to nine students. In the sixth and seventh grades, Danny attended mainstream history, social studies and science classes. He spent the remainder of his day in the "middle school" rooms. In the eighth grade, Danny's mainstream classes were increased to include art.
Mary Fenoglio, Danny's "middle school" room instructor, testified that Danny required a significant amount of one-on-one instruction in a small educational setting. She further testified that Danny was initially withdrawn when he arrived at Metropolitan, but started to participate in classroom discussions after approximately one month.
Ann McSorley, Danny's Metropolitan "middle school" room instructor for seventh grade, similarly testified that Danny required frequent supervision and intervention with written assignments. She testified that Danny *1051 required more redirection and prompting than the other students in her "middle school" classroom. Ms. McSorley stated that Danny's writing and work completion skills improved during the course of the school year.
Both Metropolitan teachers testified that Danny remains quiet and doodles when he is off-task. They testified that a consequence of Danny's quiet demeanor is that he appears to be working on his assignments when in fact he is not. In addition, Danny is unlikely to solicit assistance from his instructors when he has difficulties with an assignment. Both of Danny's Metropolitan instructors testified that, for these reasons, small class size is essential for Danny to attain an educational benefit.
Dr. Rohrbaugh, Danny's treating physician, also testified that Danny would "function better in a much smaller environment, more restricted or closed." Dr. Rohrbaugh testified that it was his opinion that Danny should only be assigned a small amount of homework given the nature and severity of his disabilities. On cross-examination, Dr. Rohrbaugh admitted that he had never observed Danny in either the public or private school setting. Moreover, the hearing panel elicited from Dr. Rohrbaugh that he advocated a specific type of learning environment, rather than a particular school setting.
Danny apparently adjusted socially at Metropolitan. He made friends at school and did not complain to his mother that he hates Metropolitan. His destructive behavior at home subsided and his parents have not discovered any more suicide notes.

Gail D. Requests Purchase-of-Service for Private School Tuition After She Unilaterally Withdraws Danny from Nipher Middle School
After Gail D. withdrew Danny from Nipher Middle School, she approached Ms. Marty Rulo, area coordinator for the Special School District, regarding payment for Danny's education at Metropolitan out of public school system funds. Ms. Rulo informed Gail D. that an IEP meeting was required before public funding for private schooling, otherwise referred to as a purchase-of-service option, could be considered.
In January of 1993, an IEP meeting was held and a new IEP was drafted for Danny. The IEP as revised in 1993 increased Danny's resource room time to two hours daily instead of one. This change was made primarily at the behest of Gail D. Mr. Kaiser and Ms. Drake felt that the additional resource room time was an unnecessary intervention. The revised IEP also provided for an after-school math clinic and weekly counseling sessions for Danny. No additional modifications or adaptations were specified. Gail D. testified that no discussion regarding Metropolitan took place at this IEP meeting. Mr. Kaiser recalled that Danny's placement at Metropolitan was discussed at the IEP meeting. The IEP team rejected placement at Metropolitan as an overly restrictive educational environment. The revised IEP recommended that Danny be educated at Nipher Middle School, not the private Metropolitan School.
Dr. Carol Migneron, principal of Nipher Middle School during the 1992-93 school year, testified that modifications and adaptations in addition to those specified in Danny's IEPs could have been implemented had Danny not withdrawn from Nipher Middle School after the first quarter. These possible additional modifications included flexible scheduling, the availability of "time outs" when needed, or additional resource room time. Dr. Migneron further testified that a "Phase II" classroom was an alternative placement option that could have been implemented at Nipher Middle School to address any need for smaller classroom size.
Although Gail D. testified that the goals and objectives contained in Danny's January 1993 IEP were appropriate, she and Carl D. disagreed with the placement recommendation of Nipher Middle School. Gail and Carl D. thereafter sought administrative review of the Special School District's decision. Gail and Carl D.'s request for purchase-of-service at the private Metropolitan School was denied after the administrative review hearing held in February of 1993.
The Special School District wrote another IEP for Danny in December of 1994, which was substantially similar to his previous IEPs. This IEP decreased the amount of *1052 recommended resource room services to 450 minutes per week, but provided for 60 minutes per week of class-within-a-class services. Due to scheduling conflicts, no faculty members from Metropolitan attended the IEP meeting held for Danny in 1994.

Impartial Due Process Hearing
On April 8, 1994, Gail and Carl D. requested an impartial due process hearing pursuant to the provisions of IDEA and Mo.Rev.Stat. § 162.961.3 (1994). A three member hearing panel ("the Panel") was convened and heard testimony over a period of four days. After hearing testimony from fourteen witnesses, the Panel rendered its decision on September 1, 1995. The Panel framed the issues for determination as follows:
"1. Whether District failed to provide Danny a free appropriate public education, and whether the parents are entitled to reimbursement for the service at Metropolitan;
2. Whether the district failed to review Danny's IEP at least annually in violation of 20 U.S.C. § 1414(a)(5), 34 C.F.R. § 300.343(d) and of the Missouri State Plan;
3. Whether the District failed to convene an IEP meeting in such a way as to facilitate the attendance and participation of Danny's private school teachers in violation of 20 U.S.C. § 1414(a)(4) and 34 C.F.R. § 300.349(b);
4. Whether the educational placement proposed by Special School District was appropriate for Danny; and
5. Petitioners are seeking prospective placement at Metropolitan School for Danny at public expense (future placement for the remaind [sic] of secondary education)."
With respect to issues 1, 2, 4, and 5, the Panel found by a two-to-one majority for The Special School District. The Panel unanimously found in favor of Special School District on issue 3.
The Panel concluded that Danny received a free appropriate public education at Nipher Middle School because the 1992 IEP "specified a present level of performance that describes Danny's characteristics or disabilities and specifies adaptations and modifications to accommodate his unique needs and listed the academic goals and objectives to address his learning disabilities of written expression and math." In addition, the Panel found that "the IEP was reasonably calculated to provide educational benefit to Danny at Nipher Middle School."
In support of its decision, the Panel cited the following evidence: 1) the testimony of Mr. Kaiser and Ms. Drake that Danny "was receiving appropriate accommodation and special attention when necessary"; 2) Danny received passing grades during his first quarter at Nipher Middle School; and 3) Mr. Kaiser communicated with Danny's regular teachers and assisted Danny with remedial skills. The Panel found that the IEP team was not afforded an opportunity to address Gail D.'s concerns about Danny's education. The Panel further concluded that a wide range of modifications, such as additional resource room time, a self-contained classroom, counseling services and flexible scheduling, could have been implemented at Nipher Middle School had Gail D. not unilaterally removed Danny from Nipher Middle School just two and one half months after school began.
The Panel recognized that Gail and Carl D. expressed legitimate concerns for Danny's unhappiness and depression. However, it concluded that they should have utilized other appropriate alternatives to first address these concerns, rather than simply withdrawing Danny from Nipher Middle School. In particular, the Panel noted that Gail and Carl D., despite their concerns about Danny's transition to middle school, discontinued his counseling sessions with Mr. Yunker at the start of sixth grade.
Finally, the Panel decided that Gail and Carl D. were not entitled to reimbursement because they "did not allow for the IEP to be amended to include changes in his schedule, educational program, related services, [and] alternative interventions that could have resulted in an educational benefit and ultimately addressed concerns."
With respect to the placement issue, the Panel concluded that Nipher Middle School was the least restrictive, and hence, the appropriate placement for Danny. According to the Panel, "[p]aramount in this decision is the facts and testimony of the Nipher Middle School staff that Danny was progressing, making passing grades, was not a behavior *1053 problem, and did not show signs of unhappiness at school." (emphasis added). The Panel felt that Metropolitan was more restrictive than necessary to educate Danny. The Panel also found that there were no substantial differences between the academic program being utilized at Metropolitan and the program "he was or could have received at Nipher." The Panel found Metropolitan's "middle school" room to be similar to Nipher Middle School's "self-contained" room, a placement option which Gail D. summarily rejected.
Ultimately, the Panel concluded that the parents' unilateral decision to place Danny at Metropolitan was "more a matter of choice than educational necessity."
After the Panel rendered its decision, Gail and Carl D. sought State Level Review of the Panel's decision pursuant to 20 U.S.C. § 1415(c). The State Level Review Officer affirmed the Panel's decision in all respects.
Thereafter, plaintiffs filed this lawsuit.

CONCLUSIONS OF LAW
The Individuals with Disabilities Education Act requires participating states and their public education agencies, such as the Special School District, to provide disabled students with a free appropriate public education. 20 U.S.C. §§ 1400-1485; Honig v. Doe, 484 U.S. 305, 308, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988).
A free appropriate public education is defined as special education and related services that: (1) have been provided at public expense, under the public supervision and direction, without charge, (2) meet the standards of the educational agency, (3) include an appropriate preschool, elementary, or secondary school education in the State involved, and (4) are provided in conformity with the IEP. 20 U.S.C. § 1401(a)(18).
An education is appropriate under the Act where the state provides sufficient support services to allow the disabled child to benefit educationally from that instruction. Rowley, 458 U.S. at 190, 102 S.Ct. 3034. While the benefit must be more than trivial, the statute does not require the state to maximize the potential of each disabled child. Id. Rather, IDEA's goal is "more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside." Id. at 195, 102 S.Ct. 3034. Achievement of passing marks and advancement from grade to grade are important  but not dispositive  factors in assessing educational benefit. Id. at 203, 102 S.Ct. 3034.

Reimbursement
In this case, plaintiffs seek reimbursement of tuition and other costs incurred in connection with sending Danny to the private Metropolitan School.
Parents are entitled to reimbursement of expenditures incurred in connection with providing their child a private special education only where the public school placement violated IDEA and the private school placement was proper under the Act. Florence County School Dist. Four v. Carter, 510 U.S. 7, 16, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993); School Committee of Burlington v. Dep't of Education of Mass., 471 U.S. 359, 369, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985); Independent Sch. Dist., 88 F.3d at 561. In addition, the United States Court of Appeals for the Eighth Circuit requires parents to "make clear to the [school] district that they want the district to `initiate'" a change in placement before they are eligible for reimbursement. Evans v. District No. 17 of Douglas County, Neb., 841 F.2d 824, 829 (8th Cir.1988). "[P]arents who unilaterally change their child's placement during the pendency of the review proceedings, without the consent of state or local officials, do so at their own financial risk." Burlington, 471 U.S. at 374, 105 S.Ct. 1996.

Free Appropriate Public Education
The primary issue to be decided in this case is whether the Special School District provided Danny with a free appropriate public education.

Missouri Standard
Plaintiffs contend that Mo.Rev.Stat. 162.670 (1994) requires Missouri's public agencies to provide disabled students with a higher level of special education than the standard enunciated in IDEA.
*1054 Mo.Rev.Stat. § 162.670 (1994), entitled "Statement of Policy," provides in pertinent part as follows:
"In order to fully implement section 1(a) of article IX, constitution of Missouri, 1945, ... it is hereby declared the policy of the state of Missouri to provide or require public schools to provide to all handicapped or severely handicapped children ... special educational services sufficient to meet the needs and maximize the capabilities of handicapped and severely handicapped children."
A free appropriate public education includes special education and related services that conform to applicable state standards. 20 U.S.C. § 1401(a)(18). Thus, a school district may be required to provide more extensive state-mandated protections which are enforceable under IDEA. See Doe By and Through Doe v. Bd. of Educ. of Tullahoma City Schools, 9 F.3d 455, 457 (6th Cir.1993), cert. denied, 511 U.S. 1108, 114 S.Ct. 2104, 128 L.Ed.2d 665 (1994).
Other circuits have reached varying conclusions as to the degree of protection afforded under similar state statutes. See, David D. v. Dartmouth School Committee, 775 F.2d 411, 420 (1st Cir.1985) (Massachusetts law imposes higher substantive standards for the education of disabled students than that required by federal law), cert. denied, 475 U.S. 1140, 106 S.Ct. 1790, 90 L.Ed.2d 336 (1986); Doe, 9 F.3d at 458 (Tennessee act does not impose higher standard than federal law); Geis v. Board of Educ. of Parsippany-Troy Hills, 774 F.2d 575, 583 (3d Cir.1985) (New Jersey statute imposes higher standard on state's school system than does federal act).
The Eighth Circuit has yet to decide this issue, and the Court found no Missouri state court case which articulates the standard of special education required by Mo. Rev.Stat. § 162.670 (1994).[8] In the absence of any binding or persuasive authority, this Court is reluctant to impose upon Missouri public agencies substantive requirements in excess of those specifically mandated by IDEA. Accordingly, federal substantive standards govern plaintiffs' claim.

Plaintiffs' Claims
Plaintiffs do not challenge the goals and objectives of Danny's IEPs. See Plaintiffs' Reply Brief at 3. Instead, plaintiffs contend that Danny did not receive a free appropriate public education because his placement at Nipher Middle School was inappropriate. Plaintiffs also allege that Special School District violated IDEA by failing to implement all of the adaptations and modifications contained in Danny's 1992 IEP.

Placement
Plaintiffs contend that Danny's placement at Nipher Middle School denied him a free appropriate public education because his unique needs require a small, highly structured educational setting. In support of their position, plaintiffs point to the following:
1) Dr. Rohrbaugh's testimony that Danny has poor organizational and social skills, as well as attentional problems, due to his neurological disorders;
2) Dr. Rohrbaugh and Mr. Yunker's testimony that a large learning environment would create insecurity for Danny and may increase his stress level and depression; and
3) Ms. Stockman's testimony that Danny's writing and math skills while a sixth grader at Nipher Middle School were at a third or fourth grade level. See Plaintiffs' Brief at 57-59.
However, the expert testimony cited by plaintiffs does not demonstrate that Nipher Middle School was an inappropriate placement for Danny. The testimony relied upon by plaintiffs related to the type of educational environment that could maximize Danny's learning potential. As stated above, IDEA does not require the Special School District to provide Danny with the *1055 best possible education. See Rowley, 458 U.S. at 195, 102 S.Ct. 3034 (IDEA's goal is "more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside."). Accordingly, evidence that Danny's disabilities would best be addressed in certain types of learning environments is not relevant to the issue of whether Danny's placement at Nipher Middle School was appropriate under IDEA. See Clynes, 119 F.3d at 613 (no violation of IDEA even though disabled student may have benefitted more from his private education because statute "does not require the best possible education or superior results.")
In support of its decision that Danny was receiving a free appropriate public education, the Panel relied upon the following evidence: 1) Danny received passing grades in his first quarter at Nipher Middle School; and 2) the testimony of Mr. Kaiser and Ms. Drake that Danny was progressing and received appropriate accommodation and attention when necessary.

Danny's Progress at Nipher Middle School Indicated That His Education Was Appropriate
Plaintiffs contend that Danny's grades at Nipher Middle School were artificially inflated by his teachers to mask his lack of progress and, therefore, the Panel erred in relying on them as an indicia of the appropriateness of Danny's education. Mr. Kaiser and Ms. Drake both testified that Danny's grades accurately reflected his academic performance during his first quarter at Nipher Middle School. Although plaintiffs presented the testimony of Gail D. and Ms. Stockman to contradict these assertions, there is no suggestion that the Panel improperly evaluated the evidence or refused to give sufficient weight to the views of professional educators in reaching its decision. The Panel observed the witnesses who testified on this issue. See, Clynes, 119 F.3d at 610; Independent School Dist., 88 F.3d at 561. Danny's passing grades are an important indicator of the appropriateness of his education at Nipher Middle School. See Rowley, 458 U.S. at 200, 102 S.Ct. 3034. The Court will defer to the findings made by the Panel.

Danny's Needs Were Accommodated at Nipher Middle School
Plaintiffs also challenge the Panel's conclusion that Danny received appropriate accommodation and attention when necessary. Gail D., Mr. Kaiser, Ms. Fenoglio and Ms. McSorley each testified that Danny often appears to be on task and working, when in fact he is not. They also testified that Danny needs frequent redirection from his instructor to complete an assignment. Finally, the witnesses testified that Danny has organizational problems.
The record as a whole supports the Panel's conclusion that Danny was receiving necessary accommodations and services at Nipher Middle School. In the resource room, Mr. Kaiser provided redirection and remediation when needed to assist Danny with his attentional problems. To combat organizational difficulties, Mr. Kaiser reminded Danny about his homework assignments and organized his textbooks. Danny's work was always accepted and graded by his mainstream instructors, even if it was not submitted in a timely fashion. Mr. Kaiser testified that assignment sheets, a specified accommodation in Danny's 1992 IEP, were utilized, but were ineffective. Although he could not recall if Danny's mainstream instructors received a summary of Danny's IEP, this information was available to all of his teachers. More importantly, Mr. Kaiser communicated with Gail D. and Danny's mainstream instructors on a regular basis to monitor Danny's progress. This evidence supports the conclusion that Danny was receiving a free appropriate public education at Nipher Middle School.
Plaintiffs also suggest that Danny's failure to adjust socially at Nipher Middle School indicates the inappropriateness of his placement. Although Danny clearly displayed signs of unhappiness at home, he appeared to be adjusting socially in his mainstream and resource room classes. While the Panel expressed concern over Danny's depression, it noted that his parents discontinued Danny's counseling sessions with Mr. Yunker at the start of his sixth grade year despite their anxiety about Danny's transition to middle school. Although plaintiffs may *1056 have been unable to continue Danny's sessions with Mr. Yunker due to the prohibitive cost, Gail and Carl D. never arranged therapy sessions with the school counselor or contacted any school officials after discovering Danny's notes about suicide and death. Moreover, even after these notes were discovered, neither his physician nor his psychologist considered Danny's depression so severe as to require hospitalization. These facts support the Panel's conclusion that Gail and Carl D. should have utilized available alternatives to address Danny's unhappiness prior to a unilateral withdrawal from Nipher Middle School.
Based on the foregoing, the Court finds by a preponderance of the evidence that Danny was receiving and could have continued to receive a free appropriate public education at Nipher Middle School.

Implementation of Danny's 1992 IEP
Plaintiffs also contend that Danny was denied a free appropriate public education because all of the adaptations and modifications specified in the 1992 IEP were not implemented immediately upon Danny's arrival at Nipher Middle School. This argument fails for several reasons.
The only evidence to support this assertion is Gail D.'s testimony that assignment sheets were not used until she specifically requested them. Mr. Kaiser testified that these sheets may not have been used for Danny during the first one or two weeks of school due to the confusion of starting a new school year. He further testified that these sheets were ineffective, so he began communicating with Gail D. on a weekly basis instead.
From the record it appears that Danny's IEP modifications and adaptations were implemented within an appropriate time period and that Danny's resource room instructor utilized an alternate adaptation calculated to provide Danny with an educational benefit, one which afforded more parental involvement, once he determined that the assignment sheets were ineffective.
Accordingly, the Court finds that Danny's education at Nipher Middle School was provided in conformity with the 1992 IEP.

Procedural Violations
Plaintiffs also allege that two procedural violations denied Danny a free appropriate public education. Procedural violations may give rise to a claim for reimbursement where the "inadequacies compromised the pupil's right to an appropriate education, seriously hampered the parent's right to participate in the formulation process, or caused a deprivation of educational benefits." Independent School District, 88 F.3d at 562.

1991 IEP
First, plaintiffs contend that the Special School District twice failed to review Danny's IEP on an annual basis in violation of 20 U.S.C. § 1414(a)(5).
According to plaintiffs, Danny's 1990 IEP should have been reviewed by March 14, 1991. In fact, Danny's 1990 IEP was not reviewed until September 11, 1991. In addition, plaintiffs assert that the Special School District violated IDEA's procedural requirements by failing to review Danny's January 1993 IEP until April 8, 1994. The Special School District responds that it was not required to review Danny's January 1993 IEP on an annual basis after his parents unilaterally withdrew him from Nipher Middle School.
The Panel determined that no IEP was drafted for the 1991-92 school year in March of 1991 because Gail and Carl D. had informed the Special School District that Danny would attend fifth grade at North Glendale instead of Annunziata. Since a new IEP was required for Danny's fifth grade year at North Glendale, Gail and Carl D. did not request an IEP meeting. The Panel necessarily determined that these circumstances justified the Special School District's failure to draft a new IEP for Danny's remaining few months at Annunziata in 1991. Similarly, the Panel found that there was no violation of IDEA's procedural requirements for failure to revise the IEP for the summer months of 1991 because Danny had not been referred or determined eligible for extended school year services.
The Panel concluded that there was at least one IEP meeting in each of Danny's school years and that, at most, the IEP team *1057 failed to review Danny's IEP annually by a lapse of only a few days. This procedural lapse, in the Panel's opinion, did not deny Danny a free appropriate public education.
With respect to the 1991 IEP, the Court concludes that any minor procedural lapse that may have occurred between a review of Danny's 1990 and 1991 IEPs did not compromise Danny's right to an appropriate education or deprive him of any educational benefits. See Independent School District, 88 F.3d at 562. Moreover, this procedural irregularity was approved by the parents, who were never denied the right to participate in the formulation of Danny's IEP. See id. Accordingly, the Court finds that this procedural irregularity did not deny Danny a free appropriate public education.

1993 and 1994 IEPs
The plaintiffs also claim a procedural violation because of a lapse between the 1993 and 1994 IEPs. In support of their argument, plaintiffs point to 34 C.F.R. § 300.341(b), which provides in pertinent part:
"(b) Private Schools and facilities. The SEA shall ensure that an IEP is developed and implemented for each child with a disability who 
(1) Is placed or referred to a private school or facility by a public agency; or
(2) Is enrolled in a parochial school or other private school and receives special education or related services from a public agency."
34 C.F.R. § 300.341(b)(2) does not apply in this case because Gail and Carl D. are not asking Special School District to provide Danny with special education and related services in addition to those services he receives at the private Metropolitan School.
The Special School District contends that 34 C.F.R. § 300.341(b)(1) applies only where the student has been "placed or referred to" the private school by the school district. Plaintiffs argue that IDEA and the regulation impose a continuing duty upon school districts to develop and implement IEPs for students unilaterally placed in private school by their parents.
At least one other circuit has adopted the Special School District's reasoning. In Amann v. Stow School System, 982 F.2d 644 (1st Cir.1992) (per curiam), cert. denied, 510 U.S. 1181, 114 S.Ct. 1228, 127 L.Ed.2d 573 (1994), the First Circuit Court of Appeals held that the parents' unilateral withdrawal of their son from public school relieved the school of the responsibility of developing or revising his IEP on an annual basis. Id. at 651.
Moreover, the note to the regulation supports defendant's position. It states, in pertinent part, as follows:
"This section applies to all public agencies ... that provide special education to a child with a disability either directly, by contract or through other arrangements. Thus if a state welfare agency contracted with a private school or facility to provide special education to a child with a disability, that agency would be responsible for ensuring that an IEP is developed for the child."
The regulation contemplates the state agency's active participation in the placement of the student at a private facility. Obviously, a school district has no input in the placement decision when a child is unilaterally withdrawn from public school by the parents.
Based on a review of the regulations and persuasive authority, this Court holds that a school district is not required to develop and implement, on an annual basis, an IEP for a disabled student once he has been unilaterally placed in a private school by the parents.
Second, plaintiffs argue that the Special School District violated IDEA's implementing regulation, 34 C.F.R. § 300.349(b), by failing to convene IEP meetings in such a way as to facilitate the attendance of Danny's instructors at Metropolitan. Their sole evidence on this point consists of the Special School District's failure to hold the January 1993 and December 1994 IEP meetings at Metropolitan.
Plaintiffs' argument fails for several reasons. First, the IEP meetings at issue were not held to discuss the placement of Danny at Metropolitan by the Special School District or to seek additional services for Danny while in attendance at Metropolitan. Thus, the regulation requiring the attendance of private school personnel is inapplicable. *1058 Second, even if the regulation did apply, it would not require Danny's IEP meetings to be held exclusively at Metropolitan. It only requires that the school district ensure the participation of the private school representative. Finally, Ms. Buckley in fact attended the December 1994 IEP meeting, even though the meeting was not held at Metropolitan.
The Court concludes that the Special School District's failure to hold the 1993 and 1994 IEP meetings at Metropolitan did not deny Danny a free appropriate public education.

Placement at the Private Metropolitan School
Gail and Carl D. are not eligible for reimbursement of the costs and expenses incurred in connection with sending Danny to the private Metropolitan School unless Nipher Middle School failed to provide a free appropriate public education and Danny's placement at Metropolitan was appropriate under IDEA.
IDEA mandates that, "to the maximum extent appropriate, children with disabilities ... [be] educated with children who are not disabled, and that special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily[.]" 20 U.S.C. § 1412(5)(B); 34 C.F.R. § 300.550(b)(1) and (2). This requirement is known as "mainstreaming" or the "least restrictive environment." A.W. by and Through N.W. v. Northwest R-1 School Dist., 813 F.2d 158, 162 (8th Cir.), cert. denied, 484 U.S. 847, 108 S.Ct. 144, 98 L.Ed.2d 100 (1987).
While IDEA evidences a strong congressional preference for mainstreaming, this preference is not absolute. Id. at 162-63; Rowley, 458 U.S. at 181 n. 4, 102 S.Ct. 3034. As a result, IDEA authorizes placement in private school at public expense when the nature and severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily. 20 U.S.C. § 1412(5)(B).
To decide whether private placement is appropriate, "the court should determine whether the services which make the placement superior could be feasibly provided in a non-segregated setting. If they can, then placement in the segregated school would be inappropriate under the Act." A.W. By and Through N.W., 813 F.2d at 163, quoting Roncker on Behalf of Roncker v. Walter, 700 F.2d 1058, 1063 (6th Cir.), cert. denied, 464 U.S. 864, 104 S.Ct. 196, 78 L.Ed.2d 171 (1983). Cost is a proper factor to consider since excessive spending on one disabled child deprives other disabled children of services. A.W. By and Through N.W., 813 F.2d at 163.
In the present case, the Court agrees with the Panel that Metropolitan is a more restrictive environment than necessary to educate Danny. As discussed above, Danny was afforded an appropriate education under the IEP developed and implemented at Nipher Middle School. Danny's IEP and placement at Nipher Middle School were calculated to provide Danny with an educational benefit. Mr. Kaiser, a member of Danny's Nipher Middle School IEP team, testified that Danny's placement at Metropolitan was considered and specifically rejected at the January 1993 IEP meeting as an overly restrictive educational environment. Therefore, this Court finds by a preponderance of the evidence that Metropolitan is an overly restrictive educational environment for Danny.
Even if a more restrictive placement were necessary to provide Danny an appropriate education, placement at the private Metropolitan school would nevertheless be inappropriate. Placement at a segregated facility is permissible only if the necessary services cannot be feasibly provided in a nonsegregated setting. A.W. By and Through N.W., 813 F.2d at 163. The Panel concluded that the instructional and behavioral strategies being utilized at Metropolitan could also be implemented at Nipher Middle School. For example, if it had been determined that Danny needed a self-contained classroom to attain an educational benefit, he could have been placed in Nipher Middle School's segregated classroom. Gail D. categorically rejected *1059 this placement for Danny. Moreover, Dr. Migneron testified that flexible scheduling, the availability of "time outs" when needed and additional resource room time could have been provided at Nipher Middle School. Because the same kinds of interventions used at Metropolitan could also be implemented in a public school setting, placement at Metropolitan, even if otherwise proper under the act, would be inappropriate under IDEA. See id.
Based on the foregoing, the court finds by a preponderance of the evidence that Danny's placement at Metropolitan would be inappropriate under IDEA.

The Evans Rule
In this Circuit, parents must first "make clear" that they want the school district to initiate a change in placement for their child before they may obtain reimbursement for unilateral placement. Evans v. District No. 17 of Douglas Co., Neb., 841 F.2d 824, 829 (8th Cir.1988); Rapid City School Dist. 51/4 v. Vahle, 922 F.2d 476, 478 (8th Cir.1990). This requirement is known as the Evans Rule. Because Gail and Carl D. never requested the Special School District to change Danny's placement before they withdrew their son from Nipher Middle School, they are now precluded from obtaining reimbursement for the cost of Danny's private school education under the Evans Rule.
Gail D. met with the 6/7 team at Nipher Middle School in October of 1992 to request additional resource time for Danny. During that meeting, she expressed her concern that Danny needed additional interventions. The 6/7 team felt that additional resource room time was unnecessary and suggested that Gail D.'s request be re-evaluated at the end of the first quarter. In addition, Mr. Kaiser knew that Gail D. was considering private placement for Danny. Through these conversations, the Special School District was made aware of Gail and Carl D.'s concerns about Danny's education. Yet, these expressions of concern were not sufficient to "make clear" to the Special School District that the parents wanted the school district to initiate a change in Danny's placement. See Evans, 841 F.2d at 829.
Plaintiffs contend that Gail and Carl D.'s request for administrative review of the January 1993 IEP constituted notice sufficient to satisfy the Evans Rule. This argument fails because the Evans Rule requires that notice be provided before parents unilaterally withdraw their child from public school. "A school district should be on notice of disagreements and given an opportunity to make a voluntary decision to change or alter the educational placement of a handicapped child." Id. at 831-32. Plaintiffs' interpretation would render the Evans rule  which is designed to afford the school district the first opportunity to decide the change in placement issue  meaningless.
The Court finds by a preponderance of the evidence that plaintiffs failed to request the Special School District to initiate a change in Danny's placement, which renders them ineligible for reimbursement.

CONCLUSION
In conclusion, the Court finds by a preponderance of the evidence that Danny was afforded a free appropriate public education under the Individuals with Disabilities Education Act. For this reason, Gail and Carl D. are not entitled to reimbursement from the Special School District for the cost of sending Danny to the private Metropolitan School.
Accordingly,
IT IS HEREBY ORDERED that the Court finds in favor of defendant and against plaintiffs on plaintiffs' claim brought pursuant to 20 U.S.C. § 1400 et seq.
NOTES
[1] The parties have requested the Court to rule on the basis of the administrative record, which consists of the following documents: 1) the transcript of the impartial due process hearing held before a three member panel in accordance with Mo.Rev.Stat. § 162.961 (1994); 2) exhibits and briefs submitted in conjunction with that hearing; 3) the panel's decision and dissenting opinion; and 4) the subsequent opinion of the State Level Review Officer. Unless otherwise noted, the testimony referred to herein was received by the administrative panel at the due process hearing.
[2] Tourette's Syndrome is a movement disorder characterized by involuntary motor or vocal movements called "tics." As in Danny's case, Tourette's Syndrome can occur in conjunction with other neurological disorders, such as Attention Deficit Disorder, learning disabilities, obsessions, compulsions and rituals. The symptoms of Tourette's Syndrome tend to wax and wane over time. Tourette's Syndrome can be treated, but not cured.
[3] Persons suffering from ADD, a neurological disorder, have difficulty focusing on a particular task and are easily distracted.
[4] A learning disability is an isolated area of educational deficiency in comparison to overall cognitive ability.
[5] Depression is a mood disorder characterized by persistent feelings of worthlessness, sadness and low self-esteem which interferes with the patient's daily functioning. The symptoms of depression tend to wax and wane over time.
[6] Special School District is a statutorily authorized political subdivision charged with the responsibility of providing special education and related services to disabled students residing in St. Louis County.
[7] An IEP is a written document containing the following information: (1) A statement of the child's present level of educational performance; (2) A statement of annual goals, including short-term instructional objectives; (3) A statement of the specific educational services to be provided to the child, and the extent to which the child will be able to participate in regular educational programs; (4) The projected dates for initiation of service and the anticipated duration of the services; and (5) Appropriate objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether the short term instructional objectives are being achieved. 34 C.F.R. § 300.346. The IEP is prepared at a meeting among a qualified representative of the local educational agency, the child's teacher, the child's parents or guardian, and, where appropriate, the child.
[8] The Court found one Missouri case, Mallory v. Drake, 616 S.W.2d 124 (Mo.Ct.App.1981), which may lend minimal support to plaintiffs' position. In Mallory, the Missouri Court of Appeals stated in dicta that Mo.Rev.Stat. § 162.670 permitted the "optimal personal development" of a disabled student where the actual capacity exceeds the average. Id. at 597. However, this language should be confined to the context of the court's discussion, which only addressed the eligibility for special services. This dicta has not been cited in any subsequent reported Missouri decision.